**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THERESE JENKINS, | ) | CASE NO. 5:15-CV-1165 |
| | ) | |
| Plaintiff, | ) | JUDGE GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Therese Jenkins ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 19, 2012, Plaintiff filed her application for POD and DIB, alleging a

disability onset date of May 27, 2011. (Transcript ("Tr.") 13.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On December 5, 2013, an ALJ held Plaintiff's

hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On

January 31, 2014, the ALJ found Plaintiff not disabled.  (Tr. 21.)  On April 10, 2015, the

Appeals Council declined to review the ALJ's decision, and the ALJ's decision became

the Commissioner's final decision.  (Tr. 1.)  On June 10, 2015, Plaintiff filed her

complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties

have completed briefing in this case.  (Doc. Nos. 10, 12.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred in his step-

two analysis, and (2) the ALJ's residual functional capacity ("RFC") is not supported by

substantial evidence.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in September 1965 and was 47-years-old on the date last

insured.  (Tr. 20.)  She had at least a high school education and was able to

communicate in English. (*Id.*)  She had past relevant work as a nurse's aide, cashier,

fast food worker, and order picker. (Tr. 216.)

### B.    Medical Evidence

#### 1.    Medical Reports

##### a.  Physical Impairments

In September 2008, Plaintiff began treatment with Deepti Parmar, M.D. (Tr. 226.)

Plaintiff reported that around 2004, a doctor diagnosed her with lupus and she attended

fibromyalgia testing. (*Id.*)  She complained of pain throughout her body and fatigue. (*Id.*)

Dr. Parmar assessed arthralgia, depression, fibromyalgia, overweight, and mastodynia.

(Tr. 226-27.)  The doctor recommended testing and prescribed medication. (*Id.*)

2

A December 2008 x-ray of Plaintiff's lumbar spine showed mild changing with spurring. (Tr. 300.) The vertebral body heights were maintained and there was no spondylolisthesis. (*Id.*)

In January 2009 Plaintiff treated with Robert Geiger, M.D. (Tr. 301, 304.) On physical examination, Dr. Geiger observed that Plaintiff was obese and slow to stand from her chair. (Tr. 301.) She had a slow, wide-based gait and was stiff in her movements. (*Id.*) Plaintiff complained of mild pain in her neck that intensified with extension, but her range of motion was unimpaired. (*Id.*) There was mild loss of lordosis in her cervical spine. (*Id.*) She had positive displacement of the right sacroiliac joint with forward flexion and positive Patrick's testing. (*Id.*) She expressed pain with facet loading maneuvers, but Dr. Geiger noted no spinal spasms. (*Id.*) Plaintiff's range of motion and strength in her shoulders, elbows, and hands was normal. (*Id.*) Plaintiff's hips were tender, but she did not complain of pain with internal or external rotation. (*Id.*) Dr. Geiger assessed sacroilitis, sciatica, multiple joint pain, and lumbago. (Tr. 304.)

In June 2009, Plaintiff presented to rheumatologist Inderprit Singh, M.D, to evaluate a potential autoimmune disease. (Tr. 296.) Plaintiff reported a history of fatigue, generalized body pain and weakness, and migraine headaches. (*Id.*) She experienced chronic neck pain radiating into her shoulder and chronic low back pain radiating into her right thigh. (*Id.*) On physical examination, Plaintiff's range of motion in her cervical spine, thoracic spine, shoulders, wrists, hips, and knees was normal. (Tr. 297.) Dr. Singh found no tenderness in these areas. (*Id.*) Her range of motion in the lumbosacral spine was minimally decreased. (*Id.*) Dr. Singh noted a number of tender points on examination. (*Id.*) The doctor concluded that the likelihood of any ongoing

3

autoimmune disease was very low. (*Id.*)  Dr. Singh explained that Plaintiff had three

main issues: insomnia with probable sleep apnea, fibromyalgia, and chronic persistent

migraines. (*Id.*)  Dr. Singh prescribed medication. (*Id.*)

On June 22, 2009, Plaintiff presented to the emergency department for a

migraine headache that persisted for two days. (Tr. 439.)  Unlike previous headaches,

Tylenol and Tramadol did not relieve her pain. (*Id.*)  She experienced some nausea.

(*Id.*)  She was diagnosed with an acute migraine headache and discharged in improved

condition after treatment. (*Id.*)  An x-ray of Plaintiff's cervical spine taken that day

showed degenerative changes and disc disease. (Tr. 295.)

On June 18, 2010, Plaintiff presented to Dr. Geiger with right hip pain for which

she was taking Morphine three times daily. (Tr. 512.)  She took Tylenol for headaches.

(*Id.*)  On physical examination, Plaintiff had good range of motion in her lumbar spine

and lower extremities. (Tr. 513.)  She had a decreased range motion in her hips and her

sacroiliac joint displaced upon testing. (*Id.*)  Plaintiff had no difficulty standing from a

seated position. (*Id.*)  She had a slow, steady gait and full strength in all extremities.

(*Id.*)  Dr. Geiger diagnosed sacroilitis. (*Id.*)  In August 2010, Plaintiff returned to Dr.

Geiger with low back pain and pain in her right hip. (Tr. 515.)  She reported that overall,

her pain was well-controlled. (*Id.*)  Walking for long periods aggravated her pain, while

medication and rest provided relief. (*Id.*)  Plaintiff walked with a slight limp, but had good

balance overall. (*Id.*)

In November 2010, Plaintiff presented to Heather Friedt, PA-C, complaining of

low back and right hip pain. (Tr. 517.)  She was having more difficulty with daily

4

activities. (*Id.*)  Sitting, walking, and standing for long periods aggravated her pain and medication was not effective. (*Id.*)  On examination, Plaintiff had pain in her lumbar spine radiating into the right hip and lateral thigh, muscle tightness, and spasms. (*Id.*)  She tested positive for radicular pain. (*Id.*)  Plaintiff's diagnoses were lumbar disc degeneration, lumbar and thoracic radiculitis, and myalgia or myositis. (*Id.*)

On March 9, 2011, Plaintiff treated with Guang Yang, M.D., for lumbar spine and right leg pain. (Tr. 521.)  She reported that her pain medication regime controlled her pain fairly well. (*Id.*)  On physical examination, Plaintiff had mild to moderate tenderness and decreased range of motion in her lumbar sacral paraspinal muscles and right sacroilic joint. (*Id.*)  Her straight leg elevation test was positive on the right. (*Id.*)

On May 18, 2011, Plaintiff treated with Dr. Yang for pain in her cervical and lumbar spine and right hip. (Tr. 523.)  On examination, Plaintiff's neurological examination was normal and her straight leg raising tests were negative. (Tr. 524.)  Her cervical, lumbar, and sacral spine were moderately tight and tender, and her range of motion in the lumbar and sacral spine was decreased. (*Id.*)  Dr. Yang diagnosed sacroilitis, lumbar disc degeneration, lumbar and thoracic radiculitis, and fibromyalgia. (*Id.*)  The doctor wrote that Plaintiff's "[c]hronic upper and lower back pain [was] fairly controlled with current medications." (*Id.*)

On May 24, 2011, Plaintiff was taken to the emergency room after her husband found her unresponsive on the floor. (Tr. 377.)  Plaintiff remained hospitalized for several days and was diagnosed with acute renal failure and syncope secondary to

probable drug over use or misuse. (*Id.*)[1]

In August 2011, Plaintiff reported to Dr. Yang that she experienced constant lumbar sacral pain and right hip pain. (Tr. 525.)  She denied pain radiating into her lower extremities. (*Id.*)  Plaintiff's current pain medication did not control her pain and caused constipation. (*Id.*)  On examination, Dr. Yang's findings were mostly unchanged from Plaintiff's May 2011 visit.  (Tr. 526.)  Dr. Yang adjusted Plaintiff's medication. (*Id.*)

By October 2011, Plaintiff reported to Dr. Yang that her medications moderately controlled her pain and allowed her to perform her daily activities. (Tr. 527.)  On examination, Dr. Yang observed that Plaintiff's range of motion in her cervical spine was normal, her strength in her arms and legs was normal, and her straight leg raising tests were negative. (Tr. 528.)  Dr. Yang also noted moderate tenderness in the cervical muscles and right sacroiliac joint. (*Id.*)  The doctor concluded that Plaintiff's chronic upper and lower back pain was improving, but she still experienced significant right sacroiliac joint pain. (*Id.*)  Dr. Yang adjusted Plaintiff's medications. (*Id.*)

During December 2011, Plaintiff report to Dr. Yang that her back pain was much improved, but she experienced cramping in her leg, particularly at night. (Tr. 529.)  Dr. Yang added a new pain medication to Plaintiff's regimen. (*Id.*)

In March 2012, Plaintiff told Dr. Yang that her back pain was much improved with her medication regimen and that she was currently employed. (Tr. 531.)  Dr. Yang found that Plaintiff's lumbar spine and right leg pain were "fairly controlled with medication" with no side effects. (Tr. 532.)

---

[1] Plaintiff's alleged onset date of disability was May 27, 2011.

6

During May 2012, Plaintiff reported to Dr. Yang that her back pain was stable, her right leg pain was intermittent, and her right shoulder had begun to hurt. (Tr. 544.) Dr. Yang observed moderate tenderness along the right shoulder joint with a positive Hawkins' test. (Tr. 545.)  The doctor added shoulder pain and rotator cuff syndrome to Plaintiff's diagnoses and prescribed a topical gel for shoulder pain. (*Id.*)

During July 2012, Plaintiff reported that the prescription gel significantly alleviated her shoulder pain. (Tr. 627.)  Her back pain was stable and her medications appropriately controlled her pain. (*Id.*)  On examination, Plaintiff's range of motion in her lumbar sacral paraspinal muscles was normal. (*Id.*)  In September 2012, Plaintiff reported that her medication regimen appropriately controlled her pain and she was employed. (Tr. 682.)  Dr. Yang maintained her treatment plan with no changes. (*Id.*)

 By October 2012, Plaintiff reported to Dr. Yang that her pain medication was not working. (Tr. 679.)  On physical examination Plaintiff had moderate tenderness and tightness in her cervical, thoracic, and lumbar spine. (*Id.*)  Her range of motion was decreased at the lumbar sacral spine, but her straight leg elevation test was negative. (*Id.*)  Dr. Yang started Plaintiff on Lyrica for nerve and fibromyalgia pain. (*Id.*)

On December 26, 2012, Plaintiff treated with James Bressi, D.O. (Tr. 674.) Plaintiff indicated that Lyrica had not provided relief and Percocet relieved her pain for only three hours. (*Id.*)  On examination, Plaintiff ambulated without difficulty. (Tr. 675.) Her lumbar spine was positive for pain on palpation with muscle tightness, spasm, and limited range of motion. (*Id.*)  She tested negative for radicular pain. (*Id.*)  Plaintiff's strength and reflexes were normal in her lower extremities. (*Id.*)  Dr. Bressi diagnosed sacroilitis, lumbar disc degeneration, and lumbar-thoracic radiculitis, and adjusted

Plaintiff's pain medication. (Tr. 675-76.)

### b.  Mental Impairments

On January 3, 2012, Plaintiff treated with Scott Schmitt, M.D., and reported that she experienced significant issues with depression and anxiety. (Tr. 541-42.)  Plaintiff had run out of psychotropic medication for two weeks, but indicated that she struggled with depression and anxiety even when taking her medication. (Tr. 541.)  She reported no history of suicide attempts or psychiatric hospitalization. (*Id.*)  On examination, Dr. Schmitt observed that Plaintiff made good eye contact, was cooperative, presented with a full and appropriate affect, and exhibited good insight and judgment. (Tr. 542.)  Dr. Schmitt also wrote that Plaintiff exhibited a moderately depressed mood, moderate anxiety, and severe anhedonia. (*Id.*)  The doctor diagnosed post-traumatic stress disorder ("PTSD") and major depressive disorder. (Tr. 541.)  He assigned a Global Assessment of Functioning ("GAF") score of 48, indicating serous symptoms.[2] (*Id.*)  Dr. Schmitt prescribed medication. (*Id.*)

On January 31, 2012, Plaintiff told Dr. Schmitt that she attempted suicide in May 2011 and was hospitalized for psychiatric treatment in August 2011. (Tr. 539.)  Plaintiff was taking medication as prescribed and reported that it made her less tearful. (*Id.*)  Dr. Schmitt's findings from a mental status examination were unchanged from Plaintiff's previous visit. (Tr. 540.)

---

[2]    The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

In February 2012, Plaintiff reported that her medication lessened her anxiety and her depression had "not been a major problem." (Tr. 537.)  Dr. Schmitt's findings on examination were mostly consistent with his prior findings, except he observed that Plaintiff's depression had improved from "moderate" to "mild, moderate." (Tr. 538.) During March 2012, Plaintiff reported some depression and continued worries about her health. (Tr. 535.)  By April 2012, Plaintiff told Dr. Schmitt that she was feeling calmer. (Tr. 641.)  Dr. Schmitt's findings remained generally unchanged on examination. (Tr. 641-42.)  In May 2012, Plaintiff explained that she was "feeling better," keeping busy around her home, and exercising more. (Tr. 571.)

When Plaintiff presented to Dr. Schmitt in June 2012, she explained that her medication helped improve her mood and relieve her anxiety. (Tr. 637.)  On examination, Dr. Schmitt opined that Plaintiff was cooperative and had a full affect. (Tr. 638.)  She exhibited mild to moderate depression, moderate anxiety, and moderate anhedonia. (*Id.*)  Dr. Schmitt assigned a GAF score of 52, representing moderate symptoms.[3] (Tr. 637.)

On a medical assessment form dated June 18, 2012, Dr. Schmitt opined that Plaintiff had "poor to no" ability to function in the following areas: relating to coworkers, dealing with the public and work stress, functioning independently, and understanding, remembering, and carrying out complex job instructions. (Tr. 574-75.)  She had a "fair" ability to follow work rules; use judgment; maintain attention and concentration; understand, remember, and carry out detailed and simple job instructions; maintain

---

[3]     A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

9

appearance; behave in an emotionally stable manner; relate predictably in a social situation; and demonstrate reliability. (Tr. 575.)

In August 2012, Plaintiff reported to Dr. Schmitt a continued positive response to her medication. (Tr. 635.)  On a form dated August 9, 2012, Dr. Schmitt listed Plaintiff's diagnoses as PTSD and major depressive disorder. (Tr. 631-32.)  He indicated that Plaintiff had "difficulty" with thinking, concentrating, and memory. (Tr. 631.)  Her frustration tolerance was low, she was easily overwhelmed due to depression and anxiety, and she experienced a significant decrease in energy and motivation. (*Id.*)  Dr. Schmitt opined that Plaintiff was "highly anxious around others" and had a "poor" ability to tolerate stress. (Tr. 631-32.)

Plaintiff saw Dr. Schmitt approximately every three months between November 2012 and October 2013. (Tr. 687-700.)  Plaintiff generally reported continued stability and a positive response to medication, aside from two sessions where she reported stress due to a nephew committing suicide, her dog being ill, and issues with her fibromyalgia. (Tr. 691, 694.)  In January 2013, Plaintiff explained that she kept busy by exercising and visiting with friends. (Tr. 697.)  Plaintiff enjoyed walking park trails and was looking forward to warmer weather. (*Id.*)  Her mood had been stable. (*Id.*)

During October 2013, Plaintiff reported that her mood was stable and she planned to assist her brother following a surgical procedure. (Tr. 688.)  Dr.  Schmitt assigned Plaintiff a GAF score of 54. (Tr. 687.)  Around December 2013, Dr. Schmitt opined that Plaintiff was "psychiatrically stable, but due to her symptoms, she may have trouble dealing with stress and change [in] a workplace setting." (Tr. 720.)

### 2.    Agency Reports

In April 2012, Rebecca Neiger, M.D., reviewed the record and assessed Plaintiff's physical limitations. (Tr. 74-76.)  Dr. Neiger opined that Plaintiff could lift up to 20 pounds occasionally and 10 pounds frequently and stand, sit, or walk for six hours in an eight-hour day. (Tr. 75.)  Plaintiff could frequently stoop, kneel, crouch, crawl, and climb ramps or stairs. (Tr. 76.)  She could never climb ladders, ropes, or scaffolds. (*Id.*)

Psychologist David Dietz, Ph.D., reviewed the record in April 2012 to evaluate Plaintiff's mental limitations. (Tr. 76-77.)  Dr. Dietz opined that Plaintiff could complete three- to four-step tasks in an environment with flexible production standards and schedules. (Tr. 77.)  She required an environment that had relatively consistent job duties on a day-to-day basis. (*Id.*)

In September 2012, Jeffrey Vasiloff, M.D., reviewed the record a second time. (Tr. 89-91.)  He opined that Plaintiff could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand or walk up to four hours, and sit for up to six hours in an eight-hour workday. (Tr. 89.)  Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. (Tr. 89-90.)  She could never climb ladders, ropes, or scaffolds. (*Id.*)  She needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 90.)

Psychologist Paul Tangeman, Ph.D., reviewed the record and assessed her mental health limitations in September 2012. (Tr. 91-92.)  He affirmed Dr. Dietz's opinion. (*Id.*)

**C.      Hearing Testimony**

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified that she was no longer able to work due to a lack of stamina and strength. (Tr. 33.)  She suffered from headaches; neck, low back, and right hip pain; and PTSD. (*Id.*)  She experienced headaches approximately four times a month. (Tr. 38.) Plaintiff suffered from depression, a lack of motivation and enjoyment of life, and a fear of leaving her home. (Tr. 35-36.)   She drove alone once or twice a week. (Tr. 36.)  Dr. Schmitt recommended PTSD counseling, but Plaintiff felt that she was not emotionally ready to attend this type of treatment. (Tr. 37.)  Of all her impairments, Plaintiff felt that she had the most difficulty coping with her lack of motivation.  (Tr. 42.)

**2.      Vocational Expert's Hearing Testimony**

Thomas Nimberger, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 60.)  The individual could perform sedentary work with the additional restrictions of frequent use of bilateral foot controls and never climbing ladders, ropes, or scaffolds. (Tr. 61.)  The individual could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) The individual was restricted from hazards, such as heights or machinery, but must be able to avoid ordinary hazards in the workplace, such as boxes, doors ajar, or approaching people or vehicles. (*Id.*)  The individual must avoid concentrated exposure to fumes, odors, dusts, gases, and poorly ventilated areas. (*Id.*)  The individual was limited to simple, routine, and repetitive tasks. (*Id.*)  She could occasionally interact with a small group of coworkers, where the contact was

12

casual in nature, and could have occasional, superficial contact with the public. (*Id.*) The individual could tolerate a few changes in the routine work setting, and when such changes did occur, they would need to take place gradually and infrequently. (*Id.*)  The VE testified that the individual would be able to perform such jobs as a polisher, mailing house worker, order clerk, and document preparer. (Tr. 62-63.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe

impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity during the period from her alleged onset date of May 27, 2011, through her date last insured of December 31, 2012.

3.    Through the date last insured, the claimant has the following severe impairments: obesity; fibromyalgia; post-traumatic stress disorder ("PTSD"); depression; lupus; and asthma.

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) with the following additional limitations: The claimant can frequently operate foot controls, bilaterally.  The claimant can occasionally use ramps and stairs but can never climb ladders, ropes, or scaffolds.  The claimant can occasionally balance, kneel, stoop, crouch, and crawl.  She is

restricted from hazards such as heights and machinery, but she is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles.  The claimant should avoid concentrated exposure to fumes, odors, gases, and poorly ventilated areas.  The claimant is limited to simple, routine, and repetitive tasks.  She is limited to occasional interaction with a small group of co-workers–where the contact should be casual in nature. The claimant is limited to occasional and superficial contact with the public. Finally, she is only able to tolerate a few changes in a routine work setting and when said changes do occur, they would need to take place gradually and would occur infrequently.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on September 10, 1965, and was 47 years old, which is defined as a younger individual age 15-49, on the date last insured.

8. The claimant has a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 27, 2011, the alleged onset date, through December 31, 2012, the date last insured.

(Tr. 15-21.)

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

15

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

      **B.**        **Plaintiff's Assignments of Error**

                **1.  The ALJ's Step Two Analysis**

Plaintiff argues that the ALJ erred in failing to consider her degenerative disc disease and chronic migraine headaches at step two of the disability analysis.  Plaintiff maintains that the ALJ ought to have deemed these impairments "severe" at step two.  For the following reasons, Plaintiff's arguments do not require remand.

As a preliminary matter, even if the ALJ erred in concluding, at step two of his analysis, that Plaintiff's degenerative disc disease and migraines were non-severe, that error is likely harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  Here, although the ALJ found that Plaintiff's headaches and degenerative disc disease were not severe impairments, he found that Plaintiff's obesity, fibromyalgia, PTSD, depression, lupus, and asthma were severe impairments.  (Tr. 15.)  Accordingly, Plaintiff cleared step two of the analysis, and Plaintiff's argument that the ALJ erred at step two is of no consequence.  *See Anthony*, 266 F. App'x at 457.

## 2.  The RFC

### a. The ALJ's Consideration of Non-Severe Impairments

17

Plaintiff contends that the ALJ's RFC finding lacks substantial support as the ALJ failed to consider all of the evidence, and in particular, Plaintiff's non-severe impairments of degenerative disc disease in the lumbar and cervical spine and her migraine headaches.  Even though the ALJ did not identify migraine headaches and these physical impairments as severe impairments at step 2,  the ALJ, nevertheless, was required to consider all of Plaintiff's impairments when determining Plaintiff's residual functional capacity (RFC), as an ALJ must consider all of a claimant's impairments, severe and not severe, at every subsequent step of the sequential evaluation process.  *See* 20 C.F.R. § 404.1545(e).

Here, the ALJ's opinion reflects that the ALJ considered Plaintiff's musculoskeletal pain and other physical impairments when formulating the RFC.  The ALJ discussed Plaintiff's reports of pain along with clinical examinations of Plaintiff's cervical and lumbar spine. (Tr. 18.)  The ALJ also cited to a number of treatment records from the relevant period that document Plaintiff's treatment for spinal issues, including degenerative disc disease. (*Id*.).  In his opinion, the ALJ explained, among other things, that the treatment notes for the physical impairments consistently showed only mild to moderate symptoms:

> In terms of the claimant's physical impairments, the objective medical evidence is inconsistent with the alleged severity of the claimant's symptoms.  More specifically, clinical observations support a finding that the claimant is able to perform sedentary work.  The claimant has been a patient at Summit Pains Specialists ("SPS") since at least May of 2011. Physical examinations report mild to moderate tenderness in the cervical, lumbar and sacral paraspinals.  She also has decreased range of motion in her lower back.  However, neurological examinations, straight leg raises and range of motion in her extremities have always been normal. (Exhibits 8F13-22, 10F1-3, 14F30-31 and 16).

18

*(Id)*. Moreover, the SPS treatment notes show that Plaintiff worked during the relevant period, that her pain regimen controlled her pain, and that her treatment plan allowed her not only to maintain employment but also to perform her activities of daily living. ("ADL").  (Tr. 523-25, 526, 528, 530-32, 544-45, 627, 660, 663, 669, 676, 679, 682) While the ALJ could have set forth a more detailed analysis of the medical records, it is clear that the ALJ considered Plaintiff's physical impairments when formulating the RFC.

The ALJ did not specifically mention migraine headaches in his RFC analysis. Aside from one treatment note, however, Plaintiff cites only to evidence pertaining to headaches that falls outside of the relevant period[4].  (Pl. Brief at 8, 12.)  Plaintiff cites to the following pages of the transcript that contain evidence related to headaches and migraines that preceded her alleged onset date of disability: (1) a June 2009 emergency room report where Plaintiff presented with migraine pain (Tr. 439.), (2) Plaintiff's statement to Dr. Singh in June 2009 that she had a history of migraines (Tr. 296.), and (3) Plaintiff's statement from June 2010 that she took Tylenol for headaches. (Tr. 512.) Following her alleged onset date, Plaintiff cites only to a May 2012 treatment note that reflects she was treated for insomnia and complained that she experienced a headache upon waking. (Tr. 469.)

The ALJ's failure to discuss this evidence does not constitute reversible error. Plaintiff points to no evidence from a medical source indicating that migraine headaches resulted in functional limitations.  Moreover, following her onset date of disability,

---

[4]    The relevant period in this case is the alleged onset date, May 27, 2011, through December 31, 2012, the date Plaintiff was last insured.

19

Plaintiff points to only one complaint to a physician that she experienced a headache. The ALJ found Plaintiff less than credible and supported this finding by explaining that Plaintiff's activities of daily living were inconsistent with a finding of disability. (Tr. 19.) The ALJ explained that Plaintiff was able to cook meals, drive a vehicle, shop for groceries, perform household chores, exercise, and visit with friends. (*Id.*)  In addition, the ALJ indicated that Claimant made inconsistent statements regarding her work activity following her alleged onset date. (*Id.*)  Moreover, Plaintiff is documented in a disability report stating that she stopped working in January 2007 because of her conditions, but on several occasions in 2011 and 2012, she reported to Dr. Yang that she was employed. (*Id.*)  Thus, substantial evidence supports the ALJ's RFC.

### b.  The ALJ's Determination of Physical Limitations

Plaintiff also contends that the ALJ ought to have considered various diagnoses and clinical findings that supported a more restrictive physical RFC as well as her complaints of pain. (Pl.'s Brief at 11-12.)  Although an ALJ is required to *consider* all of the evidence in the record, he is not required to *discuss* each item of evidence in her opinion.  *See, e.g.*, *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)* ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.")  Here, the ALJ's opinion shows that he sufficiently considered the evidence and the RFC is substantially supported. (Tr. 18-19.)  The ALJ discussed Plaintiff's lupus, arthritis, joint pain, back pain, and fatigue. (Tr. 18.)  The ALJ acknowledged that during physical examinations, parts of Plaintiff's cervical, lumbar, and sacral spine were mild to moderately tender. (*Id.*)  He also noted, however, that various clinical examinations showed that Plaintiff was intact neurologically, her straight leg raising tests were

20

negative, and the range of motion in her extremities was normal. (*Id.*)  The ALJ

attributed "little weight" to the opinions of state agency physicians Drs. Neiger and

Vaslioff, but the ALJ's RFC was more restrictive than these physicians opined as the

ALJ concluded that Plaintiff could perform only sedentary, rather than light, work.

It is well established that the claimant bears the burden of establishing the

impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

391 (6th Cir. 1999). Here, Plaintiff fails to point to any specific work limitation

documented in the record–other than Plaintiff's testimony, which the ALJ reasonably

discounted.  Accordingly, Plaintiff's arguments with regard to the physical limitations in

the ALJ's RFC lack merit.

### c.  The ALJ's Treating Source Analysis re: Mental Limitations

Plaintiff contends that the RFC is flawed because the ALJ failed to incorporate

the limitations her treating psychiatrist, Dr. Schmitt, recommended.  "An ALJ must give

the opinion of a treating source controlling weight if he finds the opinion 'well-supported

by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of

Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2))

(internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than

controlling weight, he must give "good reasons" for doing so that are sufficiently specific

to make clear to any subsequent reviewers the weight given to the treating physician's

opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (quoting S.S.R.

96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is

"imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400

(6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

In his opinion, the ALJ provided the following analysis of Dr. Schmitt's opinions:

> On June 18, 2012, Dr. Schmitt opined that the claimant had little to no ability to relate to co-workers, deal with the public, deal with work stress, function independently or understand, remember and carry out complex job instructions.  However, he also opined that she had a fair ability to follow work rules, use judgment, maintain attention/concentration, understand, maintain her personal appearance, behave in an emotionally stable manner, demonstrate reliability, remember and carry out detailed (but not complex) and understand, remember, and carry out simple job instructions.  On December 9, 2013, Dr. Schmitt opined that the claimant *may* have trouble deal[ing] with work stress and changes in a workplace setting.  This latest opinion suggests an improvement in the claimant's ability to engage in work activity and is consistent with the objective medical evidence.  I give weight to Dr. Schmitt's opinions and have incorporated them appropriately into the claimant's RFC.

(Tr. 19.)  The ALJ's opinion reflects that the ALJ attributed "weight" to Dr. Schmitt's opinions, but did not give Dr. Schmitt's findings "controlling weight."  The ALJ incorporated Dr. Schmitt's opinions into the RFC to the extent that the ALJ found appropriate: the ALJ limited Plaintiff, among other things, to occasional interaction with a small group of co-workers–where the contact should be casual in nature, to occasional and superficial contact with the public, and to a job with only a few changes in a routine work setting.

The ALJ was not required to fully adopt Dr. Schmitt's findings because the ALJ gave good reason to support his decision to attribute less than controlling weight to the

opinions.  As the ALJ explained, Dr. Schmitt's December 2013 opinion suggested an improvement in Plaintiff's functioning.  In December 2013, Dr. Schmitt felt that Plaintiff "may have issues dealing with work stress," in contrast to Dr. Schmitt's June 2012 opinion where the psychologist opined that Plaintiff would have little to no ability to deal with work stress.  Earlier in his opinion the ALJ observed that Dr. Schmitt's treatment notes reflected improvement as well. (Tr. 19.)  In early 2012, Dr. Schmitt assigned Plaintiff a GAF score of 48, representing serious symptoms, but more recently Dr. Schmitt assigned Plaintiff a GAF score of 54, indicating only moderate symptoms. (*Id.*) Accordingly, the ALJ gave good reasons for his decision not to fully adopt Dr. Schmitt's opinion, and the ALJ's RFC determination is supported by substantial evidence in the record.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: February 11, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

23